851 F.Supp. 1546 (1994)
HUTCHINSON OIL COMPANY, Plaintiff,
v.
FEDERATED SERVICE INSURANCE COMPANY, Defendant.
No. 93-CV-0154-J.
United States District Court, D. Wyoming.
March 22, 1994.
*1547 Jon B. Huss, Craig Newman, Brown & Drew, Casper, WY, Glenn E. Smith, Glenn E. Smith & Associates, Cheyenne, WY, for plaintiff.
John A. Sundahl, George E. Powers, Jr., Theodore B. D'Arcy, Godfrey & Sundahl, Cheyenne, WY, Charles E. Spevacek, Elizabeth A. Foley, Meagher & Geer, Minneapolis, MN, for defendant.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
ALAN B. JOHNSON, Chief Judge.
The parties' cross motions for summary judgment came before the Court for consideration. Jon B. Huss of Casper, Wyoming and Glenn E. Smith of Cheyenne, Wyoming appeared for plaintiff Hutchinson Oil Company ("Hutchinson"); Theodore B. D'Arcy of Cheyenne, Wyoming and Charles E. Spevacek of Minneapolis, Minnesota appeared for defendant Federated Service Insurance Co. ("Federated"). Plaintiff filed a motion for partial summary judgment on the duty to defend, which was opposed by defendant; and defendant filed its Motion for Summary Judgment, opposed by plaintiff. At the hearing held March 4, 1994, defendant sought judgment in its favor on coverage or indemnity issues, and sought a determination that the policies of insurance at issue did not provide coverage for Hutchinson's potential CERCLA liability. Plaintiff advised the Court that the only issue concerned the defendant's duty to defend and that coverage or indemnity issues were not within the intended scope of the instant declaratory judgment action. Therefore, the Court determined that the pending motions shall be treated as cross motions for summary judgment on the duty to defend issues and that the coverage issues shall not be addressed at this point in the litigation. However, the Court has considered other issues raised by defendant Federated, including matters relating to plaintiff's claims asserting bad faith and for punitive damages and attorney's fees.
The Court, having considered the motions, the materials filed both in support of and in opposition to the motions, and being fully advised in the premises, FINDS and ORDERS as follows:

Background
The instant action was filed by Hutchinson against Federated, asserting that Federated breached its contracts of insurance with Hutchinson by refusing to defend Hutchinson and provide coverage relative to demands for payment asserted against Hutchinson in connection with an Environmental Protection Agency ("EPA") removal action concerning the Mountaineer Refinery Site (the "site") in LaBarge, Wyoming. The related EPA cleanup case, brought by the PRP Committee seeking recovery of response costs incurred in connection with releases or threatened releases of hazardous substances and concerning the Mountaineer Refining Company, is also pending before this Court.[1] In the related case, the defendants are the Mountaineer Refining Company and the *1548 owners and operators of the site, although the PRP Committee[2] also advised that it may pursue cost recovery actions against additional persons who arranged for the disposal or treatment of hazardous substances at, or who transported hazardous substances to, the site. In the related case, the PRP Committee, as plaintiff, seeks costs from the defendant as well as a declaration of strict joint and several liability against the defendants for future response costs.
In 1993, Hutchinson Oil Company was notified by the EPA that it was a potentially responsible party ("PRP") under CERCLA,[3] with potential liability for the costs of cleaning up the Mountaineer Refinery site in LaBarge, Wyoming. Hutchinson's activities exposing it to potential liability under CERCLA arose by virtue of its collection and use of oil consigned and sent to the refinery site for recycling over a period of years. In its motion for partial summary judgment, Hutchinson seeks to have this Court determine whether Federated has a duty to defend Hutchinson (and if so, ultimately, provide coverage) relative to the hazardous waste site cleanup action mentioned above.
Hutchinson argues that, under Wyoming law, an insurer's duty to defend is triggered by the "potentiality" that coverage exists. It argues that the EPA's PRP Notice, and the allegations of the PRP Committee against Hutchinson, indicate that a potential for coverage exists under three of the policies issued to Hutchinson by Federated. Plaintiff also asserts that the EPA's PRP Notice constitutes a "suit" for purposes of triggering Federated's duty to defend.
Over a period of years, Hutchinson had three policies with Federated. These included:
1) Special Multi-Peril Policy 721251 (SMP 721251) (January 1985 to January 1987)
2) Business Auto Policy (BAP 721252) (January 1985 to January 1993)
3) Commercial Umbrella Policy (CU 721253) (January 1985 to January 1987).
While these various policies were in effect, used motor oil from Hutchinson's vehicles, along with that from other businesses in the Evanston area, was deposited in a tank at Hutchinson's facility and was picked up for recycling by the operator of the Mountaineer Refinery. Eventually, in 1993, the EPA sent Hutchinson the PRP Notice, designating it as a potentially responsible party with respect to the cleanup costs of the Mountaineer Refinery site contamination.[4]
Hutchinson notified Federated in writing in December 1992 of the claims of the EPA and PRP Committee against Hutchinson.[5] *1549 In that letter, Hutchinson tendered the defense of the cleanup action to Federated under the above-referenced policies and also made demand for coverage. Federated subsequently denied coverage and refused to defend Hutchinson.[6]
Hutchinson contends that through at least January 19, 1987, the SMP 721251 policy provided liability coverage for pollution, subject to the terms and conditions of the policy. Hutchinson was also insured under the Commercial Umbrella policy between January 19, 1985 and January 19, 1993. Hutchinson claims that under these two policies, the insurer's duty to defend the EPA's CERCLA claim arises. After January 19, 1987, Federated adopted an "absolute" pollution exclusion and began providing pollution coverage against third-party claims by issuing a separate policy of insurance on a claims-made basis. Hutchinson purchased the separate pollution liability policy from January 19, 1987 to January 19, 1990. Hutchinson contends that coverage existed under the SMP policy in force from January 19, 1985 through January 19, 1987.
The Business Auto Policy, during the period January 1985 to January 1991, provided pollution coverage "at least where the discharge or escape of contaminants was `sudden and accidental' and arose from the use, operation or maintenance of a motor vehicle." Hutchinson argues that because part of the pollutants may have been released because of the ownership, maintenance or use of a covered vehicle by Hutchinson, the insurer's duty to defend also arises under these policies.
Hutchinson argues that Wyoming law allows an insurer to refuse to defend an action only when a comparison of the policy with the underlying complaint shows on its face that there is no potential for coverage. Any doubt as to the existence of a duty to defend must be resolved in the insured's favor. The insurer has the burden of showing that there is no duty to defend and that the claim clearly falls outside of the policy coverage. Hutchinson cites caselaw determining that PRP Notices with allegations similar to those seen in this case are sufficient to trigger an insurer's duty to defend.
Federated, the insurer, declined to defend for two reasons. Federated argues that the EPA's CERCLA Notice does not allege an occurrence under either policy. Federated also argues that there is no coverage under any of the policies because the spillage or leakage of waste products was not "sudden and accidental" and therefore, the pollution exclusion eliminates the coverage that Hutchinson would otherwise have had under the SMP 721251 policy.
Federated responded to Hutchinson's Motion for Partial Summary Judgment by stating that Hutchinson has identified correctly the nature of the case and the appropriate legal standards under Wyoming law. Federated, however, disputes the contentions that under those standards, and argues that in light of the facts of this case, it is entitled to summary judgment on the duty to defend issue. Federated argues it has no duty to defend under the policies of insurance as the allegations in the EPA's PRP Notice do not indicate that any potential for coverage exists *1550 under the Federated policies. This is so because, Federated argues, the allegations raised in the PRP Notice to Hutchinson establish that the claim is not one where the insured is legally obligated to pay damages because of property damage during the policy period. Federated cites caselaw holding damages coverage for governmental-compelled cleanup expenses does not include coverage for preventative expenditures, and argues that the EPA's correspondence concerning the LaBarge site indicates that prevention of releases of pollutants offsite is the primary goal of the PRP Notice, rather than remediation.
Federated also asserts that the allegations do not establish the potential that property damage occurred during the policy periods. As to the business auto policies, Federated claims that the allegations establish that the property damage did not arise out of the ownership, maintenance or use of a covered auto. Federated argues that the disposal of oil consigned by Hutchinson and others to the site, which may have included motor oil taken from Hutchinson's covered autos, is too remote to establish a causal connection or relation between the claim and the ownership, maintenance or use of the insured vehicle. Federated asserts that while the allegations of the PRP Notice may establish that the property damage falls within the policies' qualified pollution exclusions, there is no evidence sufficient to meet Hutchinson's burden of proving that the exception to those exclusions is potentially implicated. Finally, Federated asserts that the allegations establish that there is no "suit" for it to defend.
As noted in this Court's introductory remarks, the issues relating to indemnity or coverage under the policies are not at issue. Any determination of whether Federated has a duty to indemnify Hutchinson is premature and should not be made until the underlying claims are resolved. Thus, the Court has not considered the arguments made by Federated concerning coverage in its Motion for Summary Judgment. However, Federated also has urged that Hutchinson's bad faith claim, as well as its claims for punitive damages and attorneys' fees, must fail. These arguments will be addressed in the later portions of this Order.

Standard of Review
Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party's burden may be met by identifying those portions of the record demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether these burdens have been met, the court is required to examine all evidence in the light most favorable to the non-moving party. Barber v. General Electric Co., 648 F.2d 1272 (10th Cir.1981).
Once the moving party has met its initial burden, the burden shifts to the party resisting the motion. That party must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Manders v. Oklahoma ex rel. Dept. of Mental Health, 875 F.2d 263, 265 (10th Cir.1989) citing Celotex, 477 U.S. at 325, 106 S.Ct. at 2554.

Discussion

1. Whether a PRP Notice is a suit for purposes of triggering the insurer's duty to defend
The first contention raised by Federated that must be addressed is whether the PRP or CERCLA Notice from the EPA to Hutchinson constitutes a "suit" for purposes for triggering the insurer's duty to defend. Federated argues that no "suit" can be instituted against the insured without an actual lawsuit having been filed. Federated relies on cases from jurisdictions holding that "suit" means an action in court, not an administrative action, and that EPA demand letters do not trigger the duty to defend. Federated also argues that the term "suit" *1551 has a common meaning to lay persons, lawyers and judges: that of a formal court proceeding initiated by filed papers. Federated argues that administrative proceedings are not the substantial equivalent of a court proceeding, citing Detrex Chemicals Industries, Inc. v. Employers Ins. of Wausau, 681 F.Supp. 438 (E.D. Ohio 1987); Technician Electronics Corp. v. American Home Assurance Co., 141 A.D.2d 124, 533 N.Y.S.2d 91 (1988); Patrons Oxford Mutual Ins. Co. v. Marois, 573 A.2d 16 (Me.1990); Central Quality Services Corp. v. Insurance Co. of North America, 1989 U.S.Dist. LEXIS 17268 (E.W.Mich.1989); and Aetna Cas. & Sur. Co. v. General Dynamics Corp., 968 F.2d 707 (8th Cir.1992).
There is authority to the contrary, finding that the term "suit" has a broader meaning than that suggested by the various courts in the cases cited above. See, e.g., Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp., 948 F.2d 1507 (9th Cir.1991); Avondale Indus., Inc. v. Travelers Indem. Co., 887 F.2d 1200 (2d Cir. 1989), cert. denied, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); A.Y. McDonald Indus. v. Ins. Co. of North America, 475 N.W.2d 607 (Iowa 1991). This Court believes that this second line of cases represents the better position and is consistent with the language of each of the policies permitting the insurer to investigate and settle claims or suits as the insurer deems expedient. The Court concludes that PRP Notices may trigger a duty to defend under the terms of the policies at issue.
Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process. Avondale Industries, Inc. v. Travelers Indem. Co., 697 F.Supp. 1314, 1321 (S.D.N.Y.1988) ("Adverse consequences can befall an insured during the administrative pollution cleanup process."), aff'd, 887 F.2d 1200 (2d Cir. 1989).
The extent of CERCLA liability is far-reaching. The ability to choose the response action greatly empowers the government. In order to influence the nature and costs of the environmental studies and cleanup measures, the PRP must be involved from the outset. In many instances, it is more prudent for the PRP to undertake the environmental studies and cleanup measures itself than to await the EPA's subsequent suit in a cost recovery action.
[A]n "ordinary person" would believe that the receipt of a PRP notice is the effective commencement of a "suit" necessitating a legal defense. The PRP letter forced Gulf to hire technical experts and lawyers to protect its interests in connection with EPA's actions. Moreover, if the receipt of a PRP notice is held not to trigger the duty to defend under CGL policies, then insureds might be inhibited from cooperation with the EPA in order to invite the filing of a formal suit.
* * * * * *
We hold that the EPA's administrative claims against the insureds triggered insurers' duty to defend. Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation. A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements. Interim Guidance of Notice Letters, Negotiations, and Information Exchange, EPA Memorandum, 53 Fed.Reg. 5298 (1988). It is in the nation's best interests to have hazardous waste cleaned up effectively and efficiently. But the insured is not required to submit to, and may in fact wish to oppose the threat. In either event, the insurer's duty to defend may well be triggered.
Further, we do not agree with insurers' complaints of obliteration of a bright-line test. The rationale behind defending insureds when a complaint has been filed is that, traditionally, that is when the jeopardy to the insureds' rights can be adversely affected. The focus should be on the underlying rationale and not on the formalistic rituals. If the threat is clear then *1552 coverage should be provided. The filing of an administrative claim is a clear signal that legal action is at hand.
Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp., 948 F.2d 1507, 1516-1517 (9th Cir.1991). This Court agrees with the reasoning of the court in Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp. and similarly concludes that the PRP Notice received by Hutchinson in this case may trigger the insurer's duty to defend.
Furthermore, it is important to again note the breadth of CERCLA and the EPA's broad powers, as well as the EPA's ability to elect the response action it deems most appropriate. For example, the EPA may opt to proceed administratively or may instead seek a judicial determination for cleanup liability in formal litigation. Even though the EPA may not obtain a final judgment against any potentially responsible party (PRP) in litigation, it may issue administrative orders constituting a legal obligation or liability of the PRP with respect to certain cleanup matters.
The absence of a judicial determination was not found to be determinative by the Wyoming Supreme Court in Compass Ins. Co. v. Cravens, Dargan and Co., 748 P.2d 724, 728 (Wyo.1988). In that case, the insurer argued that the intent of its policy was to pay only damages for which the insured was legally liable. The Wyoming Court found that the insured, who had a legal liability to clean up the oil spill in question and was also obligated by statute to clean up oil as the owner of discharged oil, had a legal liability which came within the scope of the insured comprehensive general liability policy. This Court believes a PRP Notice from the EPA creates a sufficient claim against the insured to trigger the duty to defend. It is not reasonable to find that a duty to defend, in the absence of clear, unambiguous policy language to the contrary, will arise only when the EPA has selected a judicial forum and has commenced a civil proceeding and that no duty to defend will arise if the EPA, an entity not within the control of the insured, elects to pursue its administrative options instead.

2. Whether, in the circumstances of the case and under the allegations raised in the PRP letter and EPA Notice to Hutchinson clearly establish that there is a potential for coverage under the terms of the policy which will trigger the duty to defend.
Each of the policies in question provide different coverage and, therefore, must be considered separately. However, general principles applicable to this determination may be set out to provide guidance and establish the guidelines within which the policies must be reviewed.
Wyoming law is well established. "[T]he duty of an insurer to defend a claim is broader than the duty of the insurer to indemnify." First Wyoming Bank, N.A., Jackson Hole v. Continental Insurance Co., 860 P.2d 1094, 1098 (Wyo.1993). The duty to defend is analyzed by examining the facts alleged in the complaint that the claim is based upon. Id. To determine the duty of the insurer to defend the insured, the terms of the policy and the allegations in the complaint must be examined. Id.
The duty to defend is an independent consideration in liability insurance and is created by the policy terms and arises when a claim is made against the insured. "It is, in effect, litigation insurance provided in the policy in addition to the general indemnity coverage." First Wyoming Bank, N.A., Jackson Hole v. Continental Ins. Co., 860 P.2d 1064 (Wyo.1993) [only that portion of the opinion finding a duty to defend the negligence claim against the bank was vacated on rehearing, 860 P.2d 1094].
The test of the duty to defend is generally determined by the pleadings in which a claim against the insured is made.... Normally, the four-corners rule applies to define whether the claimant has pleaded in the carrier to create its duty to defend.
* * * * * *
Where an insurance policy includes the insurer's promise to defend the insured against specified claims as well as to indemnify for actual liability, the insurer's duty to furnish a defense is broader than its obligation to indemnify. * * * The *1553 duty to defend arises whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be. * * * The duty is not contingent on the insurer's ultimate duty to indemnity should the insured be found liable, nor is it material that the complaint against the insured asserts additional claims which fall outside the policy's general coverage or within its exclusory provisions. Rather, the duty of the insurer to defend the insured rests solely on whether the complaint alleges any facts or grounds which bring the action within the protection purchased. * * * Though policy coverage is often denominated as "liability insurance", where the insurer has made promises to defend "it is clear that [the coverage] is, in fact, `litigation insurance' as well." * * * As such, "[s]o long as the claims [asserted against the insured] may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay, there is no doubt that it is obligated to defend."
... "If the claim, liberally construed, is within the embrace of the policy, the insurer must defend." Axton Cross Co., Inc. v. Lumbermen's Mut. Cas. Co., 176 A.D.2d 482, 574 N.Y.S.2d 561, 562 (1991) (citing Ruder & Finn, Inc., 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518).
860 P.2d at 1073-1074 (citations omitted; some citations omitted in original). The Wyoming Supreme Court continued its discussion of the duty to defend by stating, "[a]ll doubt as to whether a duty to defend exists are resolved against the insurer and in favor of the insured * * *, and if the complaint alleges facts which create potential coverage under the policy, the duty to defend is triggered." Id. at 1074. The insurer has the obligation to defend if, under the facts as alleged in the complaint, "there is a potentiality that the claim could be covered by the policy." Id. See also, Action Ads, Inc. v. Great American Ins. Co., 685 P.2d 42 (Wyo. 1984); Aetna Ins. Co. v. Lythgoe, 618 P.2d 1057 (Wyo.1980); Lopez v. Arryo, 489 P.2d 626 (Wyo.1971); Boston Ins. Co. v. Maddux Well Service, 459 P.2d 777 (Wyo.1967); Alm v. Hartford Fire Ins. Co., 369 P.2d 216 (Wyo. 1962).
This Court is now required to determine whether the EPA's PRP Notice to Hutchinson alleges facts which create potential coverage under the policy and whether under those facts, as alleged, there is a "potentiality that the claim could be covered by the policy." First, the PRP Notice, dated January 28, 1993, provides in part as follows:
This letter notifies Hutchinson Oil Company that it may have incurred or may incur liability under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9607(a), as amended (CERCLA), in connection with the Mountaineer Refinery Company/Mountaineer Equipment Company located near La Barge, Wyoming (the Site). This letter also notifies you of response activities currently taking place at the Site.
NOTICE OF POTENTIAL LIABILITY
The United States Environmental Protection Agency (EPA) has documented the release or threatened release of hazardous substances, pollutants, or contaminants at the Site. * * * *
* * * * * *
Based on available information, EPA believes that Hutchinson Oil Company may be a PRP with respect to this Site. Under Section 107(a) of CERCLA, PRPs include current and former owners and operators of the Site as well as persons who arranged for disposal or treatment or hazardous substances sent to the Site. EPA has reason to believe that Hutchinson Oil Company is a generator at the Site from which the release of hazardous substances is occurring or a threatened release may occur and/or that you arranged for the disposal or treatment of hazardous substances at this facility. By this letter, EPA notifies you of your potential liability with regard to this matter.
* * * * * *
SITE RESPONSE ACTIVITIES
* * * * * *

*1554 [DECISION NOT TO USE SPECIAL NOTICE;

ADMINISTRATIVE RECORD;

INFORMATION TO ASSIST RESPONSIBLE PARTIES]
* * * * * *
PRP RESPONSE AND EPA CONTACT
You are encouraged to contact the On-Scene Coordinator, Pete Stevenson, in writing within five (5) days of your receipt of this letter. Mr. Stevenson will coordinate your involvement at the Site during the response action. If EPA does not receive a timely written response from you, EPA will assume you do not wish to resolve your potential liabilities at this Site. You may be held liable under Section 107 of CERCLA for the cost of the response activities EPA performs and for any damages to natural resources.
If you are insured for any damages resulting from the release of hazardous substances, pollutants, and/or contaminants and have not already done so, we suggest that you inform your insurance carrier that EPA is considering spending public funds to investigate and/or control releases at the Site.
Please be advised that the factual and legal discussions contained in this letter are intended for notification and information purposes only. They are not intended to be, and cannot be relied upon, as final EPA positions or binding upon EPA concerning any matter discussed.
* * * * * *
Exhibit 6, Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment on Duty to Defend.
The policies at issue include a number of terms and provisions. Each of the policies at issue cover sums which the insured shall become legally obligated to pay as damages because of property damage, with the additional requirement in the Business Auto Policies that the property damage result from the ownership, maintenance or use of a covered auto. Furthermore, for coverage to apply under the policies, the property damage must occur during the policy period. Each policy excludes from coverage property damage caused by the dumping, discharge or escape of irritants, contaminants or pollutants, unless the discharge is sudden and accidental. Under the Special Multi-Peril and Commercial Umbrella Liability Policies, the unintentional discharge of any liquid from a liquid storage tank or from any underground piping or connections leading to or from a liquid storage tank is deemed to be sudden and accidental. Under the Business Auto Policy, the policy covers accidents or losses during the policy period, and defines "accident" as "continuous or repeated exposure" to the same conditions resulting in bodily injury or property damage the insured neither expected nor intended, and "loss" as direct and accidental damage or loss. The Business Auto Policy also provided pollution coverage, where the discharge or escape of contaminants was "sudden and accidental" and arose from the use, operation or maintenance of a motor vehicle.

Special Multi-Peril Policy
Under the SMP policy, the following provisions apply:
I. Coverage A  Bodily Injury Liability
Coverage B  Property Damage Liability
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement or any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment or judgments or settlements.
The policy did not provide insurance for certain items, including the following:

*1555 (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
This exclusion is "clarified by endorsement," providing:
[T]he unintentional discharge, dispersal, release or escape or any liquid from a liquid storage tank or from any underground piping or connections leading to or from a liquid storage tank shall be deemed to be sudden and accidental with respect to exclusion (f).
This policy provides the following applicable definitions:
"[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured. "[P]roperty damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or; (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Commercial Umbrella Liability Policy
Under the Commercial Umbrella Liability Policy, Federated agreed to pay on behalf of the insured the "ultimate net loss" for an "occurrence" ... which:
(1) is not covered by "underlying insurance"; and
(2) the insured becomes obligated to pay by reason of:
(a) liability imposed on the insured by law, or
(b) liability of another person or organization assumed by the insured under a "contract",
which results in "bodily injury", "personal injury", "property damage" or "advertising injury" during the policy period.
Section C. Supplementary payments provides:
1. With respect to the insurance afforded by this policy, if no insurer of an "underlying insurance" policy is obligated to do so, we will have the right and duty to defend any suit against the insured seeking damages because of "bodily injury", "personal injury", "property damage" or "advertising injury" even if any of the allegations of the suit are groundless, false or fraudulent. We may make any investigation and settlement of any claim or suit we deem expedient. We will not, however be obligated to defend any suit or respond to any claim for damages after the applicable limit of our insurance has been exhausted.
This policy sets out the following definitions:
"Occurrence" means an accident, or a happening or event, including continuous or repeated exposure to substantially the same general harmful conditions, which results in "bodily injury", "personal injury", "property damage" or "advertising injury". "Property damage" means:
a. physical injury to tangible property, including all resulting loss of use of that property; or
b. loss of use of tangible property that is not physically injured.
"Ultimate net loss" means the sum actually paid or payable to procure settlement or satisfaction of the insured's legal obligation for damages either (a) final adjudication or (b) compromise with our written consent; however, "ultimate net loss" does not include salaries of the insured's employee's or expenses incurred by the insured or by us in investigation, adjustment or litigation.
This policy excludes coverage for:
CONTAMINATION  to "bodily injury" or "property damage" arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water.

*1556 This exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
The contamination exclusion is clarified by an endorsement providing the following:
The unintentional discharge, dispersal, release or escape of any liquid from a liquid storage tank or from any underground piping or connections leading to or from a liquid storage tank shall be deemed to be sudden and accidental with respect to SECTION II. EXCLUSION 3.  CONTAMINATION.

Business Auto Policy
This policy provides that Federated will pay as follows:
1. We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.
2. We have the right and duty to defend any suit asking for these damages. However, we have no duty to defend suits for bodily injury or property damage not covered by this policy. We may investigate and settle any claim or suit as we consider appropriate. Our payment of the LIABILITY INSURANCE limit ends our duty to defend or settle.
The Business Auto Policy defines an "accident" as follows:
"Accident" includes continuous or repeated exposure to the same conditions resulting in bodily injury or property damage the insured neither expected nor intended.
"Property damage" means damage to or loss of use of tangible property.
The Business Auto Policy excludes from coverage:
Bodily injury or property damage caused by the dumping, discharge or escape or irritants, pollutants or contaminants. This exclusion does not apply if the discharge is sudden and accidental.
Contrary to the contentions of Federated, the Court disagrees that it has been established that there is no potential for coverage under any of the insurance policies at issue in this case. After reviewing the allegations of the PRP Notice and the terms of each of the policies, it is apparent that the EPA's administrative claims against Hutchinson have triggered the insurer's duty to defend under the policies. The Court determined in preceding portions of this opinion the EPA's administrative claims against the insured triggered the insurer's duty to defend, and may be treated as "suits" for duty to defend purposes.
The Court must look to the allegations in the PRP Notice sent to Hutchinson in January of 1993 in order to determine whether Federated has a duty to defend, requiring the Court to also determine whether there is a potential for coverage under any of the insurance policies. The EPA's allegations are broad and very general and do not indicate with precision the basis for its assertions of claims against Hutchinson, except as a generator of hazardous waste at the site. The threat to Hutchinson is clear, however, in that the PRP Notice unquestionably advises that the EPA intends to seek damages or costs incurred by the government in responding to any release or threatened releases at the Site. The PRP Notice states that:
[s]uch costs include, but are not limited to, expenditures for investigations, planning, oversight of private party response actions, cleanup, and enforcement. In addition, PRPs may be required to pay for damages for injury to, destruction of, or loss of natural resources, including the costs of assessing such damage.
Exhibit 6, Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment on Duty to Defend.
These allegations assert property damage has occurred.[7] The policies in question provide *1557 apparent coverage for property damage, excepting from coverage property damage caused by discharges which are not sudden and accidental. Applying Colorado law, the Tenth Circuit determined in Broderick Inv. Co. v. Hartford Acc. & Indem. Co., 954 F.2d 601, 607-608 (10th Cir.1992), that contamination of groundwater could not have occurred without the defendant's discharge into holding ponds, and without that discharge the resulting groundwater contamination would not have developed. "Thus, the property damage originated from, grew out of, and flowed from BIC's discharge of toxic chemicals into the holding ponds." Id. The Tenth Circuit then concluded, after reviewing the facts of the case, that the initial discharge was not "sudden and accidental," where the defendant had admitted it intended to discharge chemicals into the ponds and that the discharge was not unexpected. Id. at 608.
The Court believes that a similar construction of the applicable policies would yield a determination by the Wyoming Supreme Court that the contamination and cleanup costs sought by the EPA in the instant circumstances would likewise constitute property damage. Here, the EPA Notice of Potential Liability suggests that the release of contaminants may have been "sudden and accidental" so as to bring the event within the scope of policy coverage.
... There are tanks and surface impoundments at the Site which contain one or more of the following hazardous substances: 1,1,1 trichloroethane (TCA), methylene chloride (MC), and tetrachloroethylene (PCE). The tanks and surface impounds are inadequately protected against bursting or other events that would result in the loss of contents from these storage units. In addition, much of the soil in areas where drums containing hazardous materials were stored is stained.
While the assertions of the EPA and the PRP Committee may, upon subsequent investigation and discovery, prove to be unfounded with respect to Hutchinson, the EPA's PRP Notice is sufficient to implicate a potential of coverage under the policies. This is sufficient to permit this Court to find that the duty to defend has been triggered. The Court will order Federated to provide Hutchinson a defense, as requested in plaintiff's complaint for relief.
Additionally, it does appear to this Court that issues remain unresolved in the underlying action involving the Mountaineer Refinery PRP Committee and the EPA. These issues, in the opinion of this Court, are critical to a final disposition of any coverage issues that may arise in this case. Morris v. Farmers Ins. Exchange, 771 P.2d 1206 (Wyo. 1989). Therefore, all issues in this declaratory judgment action concerning coverage shall be held in abeyance pending resolution of the underlying case.

Bad Faith, Attorney's Fees and Punitive Damages
The Court agrees with defendant Federated that Hutchinson's bad faith claims against Federated must fail. Under Wyoming law, the applicable standard of care that should be applied "when evaluating a potential bad faith claim is whether the validity of the denied claim was fairly debatable." First Wyoming Bank, N.A., Jackson Hole v. Continental Ins. Co., 860 P.2d 1094, 1100 (Wyo.1993), citing Darlow v. Farmers Ins. Exchange, 822 P.2d 820, 823 (Wyo.1991) (citing McCullough v. Golden Rule Ins. Co., 789 P.2d 855, 860 (Wyo.1990)); and Hatch v. State Farm Fire & Cas. Co. Ins., 842 P.2d 1089, 1092 (Wyo.1992).
Nothing before this Court suggests that Federated's refusal to defend or provide coverage was done in bad faith or that the claim was not "fairly debatable." Federated is entitled to summary judgment in its favor as to the bad faith claim asserted by Hutchinson.
Likewise, plaintiff's claim for punitive damages must also fail. McCullough v. Golden Rule Ins. Co., 789 P.2d 855 (Wyo. 1990), stated that, in order for punitive damages to be awarded in addition to compensatory damages for the tort of bad faith, a showing of evil intent deserving of punishment or special ill-will or wanton disregard of duty or gross or outrageous conduct is required. Id. at 861. A defendant must intentionally breach his duty of good faith and in addition must also be guilty of oppression, fraud or malice. Id. No such allegations have been asserted in this case. Therefore, *1558 defendant Federated is entitled to summary judgment in its favor on plaintiff's claim for punitive damages.
Under Wyo.Stat. § 26-15-124(c), attorney's fees may be awarded if a refusal to pay the full amount of the loss covered by the policy is unreasonable or without cause. No evidence suggests that Federated's actions in refusing to provide coverage in this instance was unreasonable or without cause. Federated is entitled to summary judgment on this claim as well.
Accordingly, and for the foregoing reasons, it is hereby
ORDERED that plaintiff's Motion for Partial Summary Judgment on the Duty to Defend Issue shall be, and is, GRANTED. It is further
ORDERED that defendant's Motion for Summary Judgment as to plaintiff's claims for bad faith, punitive damages, and attorney's fees shall be, and is, GRANTED. It is further
ORDERED that remaining issues in this case with respect to coverage are premature and shall be held in abeyance, pending resolution of the underlying claims. Furthermore, Federated may refile motions for summary judgment on the duty to defend, if at a later date and after further discovery, the facts so warrant.
NOTES
[1] The related case is docketed in the United States District Court for the District of Wyoming as The Mountaineer Refinery PRP Committee, Plaintiff, v. Mountaineer Refining Company, Inc., a Wyoming corporation; Donald D. Thayer and Marika Thayer as individuals and d/b/a Mountaineer Equipment Company and d/b/a Thayer Oil Company, Defendants, Civil Action No. 93-CV-0211J.

Hutchinson had also been contacted by representatives of the PRP Committee by letter dated September 25, 1992, notifying it of Hutchinson's potential liability under CERCLA for having sent waste materials to the site. Exhibit 4, Plaintiff's Memorandum in Support of Motion for Summary Judgment on Duty to Defend Issue.
[2] The PRP Committee had, prior to filing the related civil proceeding, entered into a voluntary agreement with the EPA under which the Committee participated in and agreed to pay for cleanup activities at the site. The Administrative Order on Consent for Removal Action is in the record in this case. See Affidavit of Gordon Moore, Exhibit B, attached to Plaintiff's Brief in Support of Its Motion for Partial Summary Judgment on Duty to Defend.
[3] The Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-75 ("CERCLA"). CERCLA establishes strict liability for present and former owners of hazardous waste disposal sites, transporters of wastes, and generators of waste who arrange for transport and disposal of wastes. Under CERCLA, the EPA identifies sites contaminated with hazardous materials, and it identifies the parties "potentially responsible" for the contamination. 42 U.S.C. §§ 9601-9625. The EPA may obtain an injunction to compel the potentially responsible parties to clean-up the site, or it may conduct the clean-up itself and then sue the polluters for reimbursement. 42 U.S.C. §§ 9606-9607. Liability for clean-up costs may be imposed on one, two, or all three of the responsible parties, regardless of each entity's relative degree of fault, or responsibility for creating the polluted site. 42 U.S.C. § 9607(c). See also Village of Morrisville Water & Light Dept. v. United States Fidelity & Guaranty Co., 775 F.Supp. 718, 721-722 (D.Vt.1991).
[4] Hutchinson received a letter dated September 25, 1992 from representatives of the PRP committee for Mountaineer Refinery, indicating that it was their "understanding, based upon a receipt book kept by the owner of the Site that you or your company sent waste materials to the Site. Copies of the relevant receipt(s) is/are enclosed and also has/have been sent to the EPA. The Committee has requested that EPA add you and those other parties identified in the receipt book to its current list of PRPs and intends to actively pursue you and the other PRPs to assist in the removal action." Exhibit 4, Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment on Duty to Defend.
[5] In its Notification of Claim against it, Hutchinson advised Federated that the PRP committee had contacted Hutchinson, indicating that it had sent waste oil to the Mountaineer Refinery in La Barge for recycling. Exhibit 5, Plaintiff's Memorandum in Support of Motion for Summary Judgment on the Duty to Defend.
[6] Coverage was denied by letter dated January 27, 1993. In that letter, Federated indicated that through its investigation, it had determined that Hutchinson's first contact with the Mountaineer Refinery was in late 1985 or early 1986 through 1988. Federated stated that the policy period was January 19, 1985 through January 19, 1986, the time during which the SMP 721251 policy was in effect. Hutchinson asserted that the EPA claims were not an "occurrence," that the claims were not of an "accident" causing property damage, and that there were not facts which would permit the "sudden and accidental" exception to the pollution exclusion to apply. As to the Umbrella Policy, Federated asserted that the pollution exclusion precluded coverage. As to the Business Auto Policy, Federated asserted that because Hutchinson did not deliver product to the Refinery, the Business Auto Policy would not be applicable. For the policy period January 19, 1986 to January 19, 1987, Federated determined that the absolute pollution exclusion precluded coverage under the SMP 721251 policy. For the CU and BAP policies, the analysis remained the same as for the previous year. For the policy period April 8, 1987 to April 8, 1988, Federated again relied on absolute pollution exclusion precluding coverage for the EPA claim at issue. A similar analysis pertained for January 9, 1988 to date.
[7] There is a significant split in authority as to whether EPA response costs constitute property damages within the meaning of a comprehensive general liability policy. The defendant provided the Court with supplemental authority in this regard, by letter dated December 13, 1993. Included in that letter was a state-by-state listing of cases from Ostrager & Newman, Insurance Coverage Disputes (5th ed. 1992) providing a survey of cases on this issue.